## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUSIANA

GULF RESTORATION NETWORK, INC.   *
AND SIERRA CLUB, INC., *Plaintiffs*    * Case No:
              *
*versus*           * Judge:
              *
KEN SALAZAR, SECRETARY OF THE DEPARTMENT * Magistrate:
OF INTERIOR;  WILMA LEWIS, ASSISTANT SECRETARY, *
LAND AND MINERALS MANAGEMENT, DEPARTMENT *
OF THE INTERIOR; S. ELIZABETH BIRNBAUM, DIRECTOR,*
MINERALS MANAGEMENT SERVICE, DEPARTMENT OF *
THE INTERIOR, *Defendants*      *
* * * * * * * * * * * * * * * * * * * * * * *

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

Plaintiffs Gulf Restoration Network, Inc. and Sierra Club, Inc. bring this suit against the United States Department of Interior's Minerals Management Service ("MMS") to invalidate an illegal waiver of its own safety regulations, a waiver limited to offshore oil and gas exploration in the Gulf of Mexico, below Louisiana, Mississippi and Alabama only.  This waiver, called a "Notice to Lessees" ("NTL"), was used by MMS to grant British Petroleum ("BP") a permit to drill in 5000' of water without BP's having to first conduct blow-out and worst case oil spill response analysis required in virtually every other part of the country that allows offshore drilling.  This exemption contributed to the BP oil spill disaster now unfolding in the Gulf of Mexico.

The Outer Continental Shelf Lands Act (OCSLA) requires MMS approval of all drilling activities on federal leases. Lessees must file an Exploration Plan ("EP") describing the proposed activities.  MMS must review the plan to ensure that the proposed activities will not:

(1) Cause serious or undue harm or damage to life, property, ... or the marine, coastal, or human environment;

(2) Unreasonably interfere with other uses of the area;

(3) Interfere with or endanger operations on other leases;

(4) Result in pollution;

(5) Create hazardous or unsafe conditions; or

(6) Disturb any site, structure, or object of historical or archaeological significance.

In 2005, after extensive public notice and comment, the MMS adopted regulations that set national standards governing oil and gas drilling on the Outer Continental Shelf ("OCS"). These regulations require that every Exploration Plan contain public disclosures of the highest volume of crude oil that could be discharged from an uncontrolled well blowout, the maximum flow rate, duration and volume of such a blowout, the likelihood that the blowout could be stopped by surface intervention, rig package constraints and the availability of a rig to drill a relief well, as well as the time needed to drill such a relief well. The regulations also require the oil company to describe and analyze the response to the "worst case" spill from such an exploration well. Together, these requirements ensure that operators think about what can go wrong and how to prevent it, or mitigate the damage. These requirements also provide both the regulators and public with adequate information to make informed decisions based on risks and benefits.

However, on April 1, 2008, Lars T. Herbst, the Regional Director of the Minerals Management Service, Gulf of Mexico, issued Notice to Lessee 2008 G-4, which exempted offshore exploratory drilling operations from compliance with the Blowout Scenario Disclosure and portions of the Worst Case Oil Spill Response requirements found in the governing federal

rules.  This Notice to Lessee (NTL) effectively repealed most of those requirements for the operations most at risk for blowouts – exploratory drilling operations.

The Gulf Restoration Network and the Sierra Club challenge this Notice to Lessees ("NTL") because it is an unlawful rule under the Administrative Procedure Act.  The NTL was not published and presented to the public for evaluation and comment as required by that Act.  In addition, the NTL violates the National Environmental Policy Act because if fails to include an environmental assessment or an environmental impact statement.  Thus, this complaint seeks to have the regulatory exemptions granted by the NTL invalidated, and asks the Court to order the Minerals Management Service to stop using the unlawful exemptions in the Notice to Lessees as a basis to approve drilling operations without full compliance with the underlying regulations.

## JURISDICTION AND VENUE

1.      This Court has federal question jurisdiction over this action under 28 USC §1331.

2.      Venue of this action is proper in this Court under 28 U.S.C. §1391(e), in that the action that is the subject of the case was taken by the Regional Director of the Minerals Management Service  in New Orleans.

## PARTIES

3.      Plaintiff Gulf Restoration Network ("GRN") is a network including commercial and recreational fishermen, environmental and fishing groups, and other citizens' groups and individuals committed to restoring the Gulf of Mexico to an ecologically and biologically sustainable condition.  GRN's members live in the five Gulf states of Texas, Louisiana, Mississippi, Alabama and Florida, and nationwide, and include a substantial number of residents who live on the coastline Louisiana.

4.      Hundreds of GRN's members in the coastal states use the Gulf of Mexico for commercial and recreational fishing and shellfish harvesting, for chartering transportation, and for traditional purposes such as swimming and wildlife observation.

5.      Sierra Club is a non-for-profit organization dedicated to the protection and preservation of the environment and our natural resources. Sierra Club is one of the oldest and largest conservation groups in the country, with over 700,000 members nationally in sixty-four chapters in all of the 50 states, the District of Columbia and Puerto Rico. Approximately 3,000 members of the Sierra Club are residents of Louisiana. Sierra Club brings this action for itself and as representative of its members in the State of Louisiana.

6.      A substantial number of members of the Louisiana Chapter of the Sierra Club use the waters of the Gulf of Mexico in that state for recreational fishing and/or shellfish harvesting and for traditional purposes such as swimming and wildlife observation.

7.      The members of the Gulf Restoration Network and the Sierra Club are irreparably injured by the regulatory waivers contained in the NTL, such as the exemption of offshore exploratory drilling in the Gulf of Mexico from the Blowout Scenario Disclosure and Worst Case Oil Spill Disclosure requirements.  This harm is both present and real.  Members of the Gulf Restoration Network and the Sierra Club are currently injured by the BP Deepwater Horizon oil spill's adverse impacts on their uses of the near-shore waters as described in paragraphs 4 and 6. The Plaintiffs' use of the Barataria/Terrebonne Estuary, Mississippi River Delta and Gulf Coast and the surrounding waters will be at further risk if the MMS continues to promulgate unlawful waivers and apply the Blowout Scenario Disclosure exemption and the Worst Case Oil Spill Disclosure exemption to offshore drilling in the Gulf of Mexico contained therein.

8.      Defendant Ken Salazar is the Secretary of the Department of the Interior of the United States.

9.      Defendant Wilma Lewis is the Assistant Secretary, Land And Minerals Management, Department Of The Interior and is sued in her official capacity.

10.     Defendant S. Elizabeth Birnbaum is the Director of the Minerals Management Service, Department of the Interior.

## THE BLOWOUT SCENARIO DISCLOSURE RULE AND THE WORST CASE OIL SPILL RESPONSE RULE

11.     The administrative rules of the MMS include rules governing Exploration Plans for drilling of offshore exploratory wells.  Those rules are set out at 30 CFR § 250.101 et seq.

12.     As they relate to the potential major spills into the sea of crude oil from drilling rig blow-outs, the governing rules include 30 CFR § 250.213(g), which requires – for every exploratory drilling plan – disclosure of a Blowout Scenario.

13.     The required Blowout Scenario disclosure requires the proposed operator to disclose the volume of crude oil that could be discharged in a blowout, as well as the potential for controlling a blowout.  This regulation includes eight mandatory components:

    a) The maximum flow rate of a potential blowout;

    b) The total volume that could be discharged;

    c) The maximum duration that the discharge could continue;

    d) The potential for the well to … naturally occlude;

    e) The likelihood that the blow-out could be stopped by surface intervention such as using divers and equipment to cap the well;

    f) The availability of a drilling rig to drill a relief well;

    g) Rig package constraints; and

5

h)  The estimated time it would take to drill a relief well.

14.     The Worst Case Oil Spill Response requirement set out in 30 CFR

§250.219(a)(2)(v) requires exploratory drilling plans to provide a description of the Worst Case

Oil Spill Scenario.

15.     These disclosures must include the volume estimate of a spill based on the

reservoir's characteristics, a trajectory analysis identifying onshore and offshore areas that the

discharge could potentially affect, a list of resources of special economic or environmental

importance that potentially could be impacted and a discussion of the planned response to the

discharge during adverse weather conditions and to a flow lasting 30 days.

16.     The Worst Case Oil Spill Response rules also require a detailed description of the

response equipment including the effective daily oil recovery capacity, disposal equipment, an

estimation of individual times needed for procurement of recovery equipment and personnel,

equipment transfer time, travel to the deployment site and time for equipment deployment.  30

CFR § 254.26(d).

17.     The Blowout Scenario and Worst Case Oil Spill Response rules are designed to

identify both mechanical and human pathways of potential error, to inform purchase and process

decisions based on real risk analysis and to ensure proper planning to avoid and/or mitigate

disaster, by both the operator (such as BP) and the oversight agency (MMS).

18.     For drilling blocks that have already been leased, the Blowout Scenario disclosure

requirement and the Worst Case Scenario Response are needed to evaluate the appropriateness of

permit conditions.  For example, if the exploratory well is in very deep water, surface

interventions are less likely to stop the blowout, making a several week or several month spill

likely.  Likewise, the time needed to move specifically geared deepwater drilling equipment in

6

place and to drill a relief well should mandate permit conditions including enhanced and redundant safety measures designed to prevent or stop blowouts.

19.      The information also is of value to the members of both the GRN and the Sierra Club.  Louisiana's coast contains forty percent of the remaining coastal wetlands in the lower states, wetlands already severely impacted by oil and gas exploration.  These wetlands are directly responsible for one-third of the total seafood harvest in the lower states and critical to the way of life of unique Acadian and Native American cultures for which South Louisiana is world renowned.  Knowing the specific risks associated with exploration of specific reservoirs by specific exploratory drills informs the extent of threat and helps to identify coastal resources of special economic or environmental importance that could be destroyed by a blowout and spill.

20.      The risk of a catastrophic blowout and the extent and duration of an oil spill must be publicly disclosed for the public and plaintiffs' members to have a meaningful opportunity to engage in democratic debate concerning the benefits of production against the inherent economic and environmental costs.

21.      Sadly, MMS' regional (illegal) rules thwarted these benefits of full disclosure. Much like the failed levees in Hurricane Katrina, when real data is replaced by assumption, disaster is not far behind.  The BP Deepwater Horizon blowout and spill have graphically illustrated this fact.

## IRREPARABLE INJURY

22.      Between 1960 and 1996 there were at least 150 blowouts in the outer continental shelf of the Gulf of Mexico.  Offshore oil well blowouts in the outer continental shelf have recurred at a general rate of about 6 blowouts per thousand wells for past 50 years.

23.     Over that course of time the frequency of blowouts per foot drilled have remained at a fairly stable rate, even with the advancement of new technologies and through blowout prevention procedures designed to improve operator response.

24.     Historically, almost all blowouts have been on exploratory wells.

25.     Exploratory drilling presents unique dangers because reservoir pressures are estimated and not known.  In the deep waters, blowout risk is enhanced as oil tends to be under extremely high pressure with low fracture gradients.

26.     Deep water drilling also substantially increases the likelihood of subsea equipment damage, which also in turn increases the risk of blowouts.  For instance, blowout preventers – hydraulic rams that lie on top of the well head on the sea floor – are more likely to fail because of corrosion or because of extreme water pressure.

27.     In addition, the potential volume of uncontrolled releases is generally higher.  The oil reservoirs sought are very large.  To justify the high costs of drilling in extremely deep waters, the oil reservoirs are generally very large.

28.     Deep water drilling also poses the threat of more severe and long-lasting oil spills from blowouts because it takes several months to position the unique equipment needed and to drill a relief well.

29.     On April 20, 2010, the exploratory well being drilled by the Deepwater Horizon suffered a blowout about 45 miles off the coast of Louisiana in 5,000 feet of water.  The blowout leaked at a rate of at least hundreds of thousands of gallons of crude oil per day and may continue to leak until at relief well is drilled three or more months from now.

30.     The scope of the Deepwater Horizon spill overwhelmed spill response resources available in this region and required both military intervention and drawing down stocks of response equipment from other parts of the United States, some from as far away as Alaska.

31.     Had MMS not waived the regulatory requirements as described below, had BP done a proper Blowout Scenario and Worst Case Oil Spill Response analysis, these critical planning flaws may have been avoided.

### THE 2008 NOTICE TO LESSEES

32.     On April 1, 2008, the Minerals Management Service Gulf of Mexico Region issued a Notice to Lessees and Operators of Federal Oil and Gas leases in federal waters of the Gulf.  The Notice, NTL 2008-G04, is attached as Exhibit 1.

33.     The Notice set out the information needed to be filed in order to obtain approval of exploration plans in the Gulf of Mexico.  Where 30 CFR § 250.213(g) requires the Blowout Scenario disclosure and  30 CFR § 250.219(a)(2)(v) requires disclosure of the Worst Case Oil Spill Response Scenario (as described in 30 CFR § 254.26), the Notice to Lessees exempted *all* lessees from these requirements unless they are specifically *included* in one of five categories. (Exhibit 1, page, 8, 19).  In practical effect, the NTL exempts almost all exploratory drilling that could take place in the Gulf of Mexico south of Louisiana, Mississippi and the sliver of Alabama that touches the Gulf Coast (Mobile and surrounds) from the disclosure requirements.

34.     The first category of activities exempted from the weakened regulatory requirements of the Notice to Lessees are activities near Florida.  As Florida maintains a drilling moratorium in all waters off and near the coast of Florida, the inclusion applies to no one.

35.     The second category of activities for which the NTL leaves intact the regulatory requirements is activities within the Protective Zones of the Flower Garden Banks and Stetson

Bank, deep water coral formations off the coasts of Texas and Louisiana which are designated as National Marine Sanctuaries.  The Flower Garden Banks have an extensive protective zone in which no oil drilling is permitted, so this inclusion applies to very few operations.

36.     The third category of activities for which the NTL leaves intact the regulatory requirements is "surface facilities" in, or which support, subsea developments in water depths greater than 400 meters (1312 feet).  However, the Minerals Management Service does not interpret this inclusion as being applicable to offshore operations such as the Deepwater Horizon.  Thus, this inclusion does not apply to operations with potentially catastrophic blowout risks.

37.     The fourth category of activities for which the NTL leaves intact the regulatory requirements is initial and supplemental development (post discovery preparations for production) with new multi-well structures for which Louisiana is the affected state.  As almost all blowouts occur in exploratory wells, this inclusion leaves out the class of operations with the greatest chance of catastrophic blowouts.  The Deepwater Horizon was drilling one such well and thus was not the development operations covered by this inclusion.

38.     The final category of activities for which the NTL does not apply is for both exploratory wells and development operations where Texas is the affected state.

39.     To the best of plaintiffs' knowledge, there is no science based reason to include some Gulf of Mexico states and exclude others, or to exclude many exploratory drilling operations.

## COUNT I

**THE NOTICE TO LESSEES WAS AN AMENDMENT OF AN ADMINSTRATIVE RULE THAT DID NOT COMPLY WITH THE RULEMAKING REQUIREMENT OF THE ADMINISTRATIVE PROCEDURE ACT**

40.     Under the Administrative Procedure Act, a "rule" is "the whole or a part of any agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy . . ."  5 U.S.C. § 551(4).

41.     When an agency "formulate[s], amend[s], or repeal[s] a rule" it must follow the Administrative Procedure Act's requirements for rule making.    5 U.S.C. § 551(5).  These include publication of the proposed rule in the Federal Register, opportunity for public comment, and a general statement of basis and purpose.  5 U.S.C. § 553.

42.     The Notice to Lessees, NTL 2008-G04, was not published in the Federal Register and there was not an opportunity for public comment.

43.     The Notice to Lessees, NTL 2008-G04, is contrary to an existing regulation, to wit, 30 CFR 250.213(g) and 30 CFR § 250.219(a)(2)(b).

44.     The Notice to Lessees, NTL 2008-G04, is a rule that was not promulgated in accordance with the rulemaking requirements of the Administrative Procedure Act.

## COUNT II

### THE NOTICE TO LESSEES WAS ISSUED IN VIOLATION OF THE NATIONAL ENVIRONMENTAL POLICY ACT

45.     In 1969, Congress, "recognizing the profound impact of man's activity on the interrelations of all components of the natural environment, particularly the profound influences of population growth…, resource exploitation … and new and expanding technological advances, and recognizing further the critical importance of restoring and maintaining environmental quality to the overall welfare and development of man," enacted NEPA, declaring it to be "the continuing policy of the Federal Government … to use all practical means and measures … to create and maintain conditions under which man and nature can exist in

productive harmony, and fulfill the social, economic and other requirements of present and future generations of Americans." (NEPA §101(a), 42 USC §4331(a)).

46.     NEPA is our basic national charter for protection of the environment.  It establishes policy, sets goals, and provides means for carrying out the policy.  Section 102(2) of NEPA contains "action-forcing" provisions to ensure that Federal agencies act according to the letter and spirit of the Act.  The President, the Federal agencies and the courts share responsibility for enforcing the Act so as to achieve the substantive requirements and goals of the Act.  40 CFR §1500.1(a).

47.     To achieve those goals and policies, NEPA requires that all agencies of the Federal Government shall include in every recommendation for or report on major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on:

(i)     the environmental impact of the proposed action,

(ii)    the adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii)   alternatives to the proposed action,

(iv)    the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v)     any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 USC §4332(C)).

48.     Pursuant to NEPA and Executive Orders Nos. 11514 and 11991, the White House Council on Environmental Quality ("CEQ") promulgated regulations implementing and expounding upon the provisions of NEPA requiring that all Federal agencies prepare an Environmental Assessments ("EA") and/or an Environmental Impact Statement ("EIS") to

determine the potential environmental effects of proposed Federal actions.  Those regulations are

promulgated at 40 C.F.R. Part 1500 et seq. ("the CEQ Regulations")

49.     Under the CEQ regulations, the process of assessing the environmental impact of

a proposed Federal action is normally divided into three major steps (40 C.F.R. §1501.4):

> A.     Preparation of an environmental assessment ("EA"), which is defined as a "concise public document that serves to briefly provide sufficient evidence and analysis for determining whether the proposed Federal action may significantly affect the quality of the human environment; (40 CFR §1508.9).  The preparation of an EA may be omitted if the agency decides that the proposed action merits preparation of an EIS.  (40 CFR §1501.3, 1501.4).

> B.     If the EA determines that the proposed federal action will not significantly affect the environment, prepare a Finding of No Significant Impact ("FONSI"), which is defined as a document briefly presenting the reasons why an action will not have a significant effect on the human environment and for which an environmental impact statement therefore will not be prepared.  (40 CFR §1508.13).

> C.     If the agency determines that the proposed federal action may significantly affect the environment, commence the scoping process to prepare an EIS. (40 CFR §1501.4).

50.     MMS's reliance on NTL 2008-G04, effectively waiving the blowout scenario and

worst case spill requirements, is an action that may significantly affect the quality of the human

environment, in that it could and in fact has led to offshore oil and gas drilling without adequate

protections against or planning for an uncontrolled blowout.  The MMS nonetheless did not

prepare any NEPA documentation or analysis with respect to the Notice to Lessees.  This

constitutes a violation of NEPA, and any use of the illegal provisions of the Notice to Lessees

must be enjoined until the MMS prepares adequate NEPA documentation.

## PRAYER FOR RELIEF

**WHEREFORE** Plaintiffs request that this court:

1) Declare that the exemptions from the Blowout Scenario disclosure requirement and

from the Worst Case Oil Spill response requirement created in the Notice to Lessees are

unlawful amendments to 30 CFR § 250.213(g) and § 250.219(a)(2)(v) because they were

adopted without compliance with the notice and comment requirement of the Administrative

Procedure Act.

2)  Issue a preliminary and permanent injunction that prohibits defendants from applying

the exemption from the Blowout Scenario disclosure and Worst Case Oil Spill response

requirements set out in the Notice to Lessees;

3)  Declare 30 CFR § 250.213(g) and § 250.219(a)(2)(v) as the applicable and controlling

rules for all exploratory drilling plans in the Gulf of Mexico;

4)  Order the MMS to review all deepwater permits granted under NTL 2008-G04

pursuant to 30 CFR § 250.284, to reduce the risk of a disaster repeating itself;

5)  Award the Plaintiffs attorneys' fees and costs; and

6)  Grant all further relief allowed by law and which the court deems just and proper.

Respectfully Submitted:

*Counsel for Plaintiffs*:
Robert Wiygul (LA #17411)
1011 Iberville Drive
Ocean Springs, MS 39564
Office: (228) 872-1125
Fax:    (228) 872-1128
robert@waltzerlaw.com

David G. Guest (FL #267228)
Monica K. Reimer (FL #90069)
*Pro-Hac Vice Application to be submitted*
Earthjustice
P.O. Box 1329
Tallahassee, FL  32302
Phone:  (850) 681-0031
Fax:    (850) 681-0031
DGuest@Earthjustice.org

Joel Waltzer (LA #19268)
3715 Westbank Expressway, Ste. 13
Harvey, LA  70058
Office:  (504) 340-6300
Fax (504) 340-6330
joel@waltzerlaw.com